[Cite as *Scavio v. Ordway*, 2010-Ohio-984.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## SHELBY COUNTY

THOMAS P. SCAVIO,

    PLAINTIFF-APPELLEE,

                                         CASE NO. 17-09-07

    v.

KAREN L. ORDWAY,

    DEFENDANT-APPELLEE,
    -and-                                O P I N I O N

MARSHA YEAGER, ET AL.,

    DEFENDANTS-APPELLANTS.

Appeal from Shelby County Common Pleas Court
Domestic Relations Division
Trial Court No. 96 DV 144

**Judgment Affirmed**

**Date of Decision: March 15, 2010**

APPEARANCES:

    *Stephen W. King* for Appellants

    *Beverly Hancock* for Appellee, Karen Ordway

    *Andrew D. Lucia*, Guardian Ad Litem

**ROGERS, J.**

{¶1} Defendants-Appellants, Paul and Marsha Yeager, appeal the judgment of the Court of Common Pleas for Shelby County, Domestic Relations Division, awarding Defendant-Appellee, Karen Scavio nka Ordway, custody of Adriana and Vincent Scavio. On appeal, the Yeagers argue that the trial court erred in failing to uphold the decision of the magistrate, which found that transfer of custody of Adriana and Vincent from them to Karen would be detrimental to the children. Based upon the following, we affirm the judgment of the trial court.

{¶2} Thomas Scavio and Karen Scavio were married in December 1993 and two children were born of the marriage, Adriana (D.O.B. 12/30/1993), and Vincent (D.O.B. 8/2/1995) (hereinafter jointly referred to as "the children"). In July 1997, Thomas and Karen terminated their marriage and began operating under a shared parenting plan. In November 1997, Thomas moved for termination of shared parenting and for his designation as the children's residential parent and legal custodian, which the trial court granted. The trial court granted Karen parenting time with the children and ordered her to pay child support to Thomas.

{¶3} In December 2007, Thomas died. Thereafter, the children's paternal uncle and aunt, Paul and Marsha Yeager, obtained temporary custody of the children. In February 2008, the children's paternal grandmother, Marjorie Scavio, filed a complaint in Erie County to establish custodial rights and a motion for

emergency custody of the children on behalf of the Yeagers, which the Court of Common Pleas for Erie County, Juvenile Division[1], granted. Thereafter, the following events gave rise to the issues presented in the case sub judice.

{¶4} In April 2008, Karen filed a motion to change custody, stating that she was entitled to custody of the children upon Thomas' death; that she was not aware of Thomas' death until March 2008 when she received the motion and complaint filed by Marjorie on behalf of the Yeagers; and, that her right to the children was paramount to any other person. Thereafter, the Yeagers filed a motion to intervene as parties, which the trial court granted.

{¶5} In August 2008, the Court of Common Pleas for Erie County, Juvenile Division, sua sponte transferred the case to the Court of Common Pleas for Shelby County, Domestic Relations Division.

{¶6} In October 2008, a magistrate conducted an in camera interview with the children, and, thereafter, held a hearing, at which the following testimony was heard.

{¶7} Karen testified that she had resided in Shelby County, Ohio, since 1996; that she was employed as a nurse and earned enough money to support the

---

[1] Marjorie Scavio's February 2008 complaint to establish custodial rights and motion for emergency custody on behalf of the Yeagers were made part of the record in August 2008, and the judgment entry of the Court of Common Pleas for Erie County, Juvenile Division, granting emergency custody of the children to the Yeagers was incorporated into the record via the Yeagers' July 2008 motion to intervene as parties in the case.

children; that she owned a four-bedroom home with sufficient room for the children; that she was current with child support payments; that she had six children, including the two Scavio children, with three different fathers, two of whom she had been married to; that only two of her children still lived in her home; that no child in her custody had ever been adjudicated neglected, dependent, or abused; that her eldest child was working full time and earning a masters degree; that her second eldest child was working full time and a full time student; that her next two children attended high school, participated in multiple activities, and were good students; and, that she had not abandoned the Scavio children and wanted custody of them.

{¶8}    Karen continued that she had not seen the Scavio children since the summer of 2005, except in court; that she did not know the children's teachers, doctor, or dentist; that she did not know if the children had any health problems; that she had not attended any school conferences or activities for the children, and did not know what activities they were involved in; that she had talked to the children via telephone approximately ten to twelve times over the previous three years; that she had not physically visited with the children for the previous three years, but that she did maintain a relationship with them via telephone; that she had health insurance; and, that, prior to his death, Thomas moved approximately

eight times and did not always immediately report his new address to her, which interfered with her ability to visit the children.

{¶9} Marsha Yeager testified that she and Paul had taken the children shopping, had them over to their home to watch movies and stay overnight, and attended their sporting events; that she was aware that the children had little to no contact with Karen over the previous five years; that, on some occasions, the children expected to see Karen and would have their bags packed, but Karen "wouldn't show up" (hearing tr., p. 42); that these incidents were "devastating" to the children (Id. at p. 42); that, since Thomas died, Karen called occasionally, but had not come to see the children; and, that Thomas had only moved four times since relocating to Erie County.

{¶10} Marjorie Scavio testified that she had a very close relationship with the children; that the children had not seen Karen for over three years at the time of the hearing; that Thomas had moved only four times since the divorce; that the children had only occasional phone contact with Karen over the last three years; that she was aware of their limited contact because she babysat the children when Thomas was working during the evening and after he became disabled from cancer, but that she was not with the children all of the time; that Karen had visitation with the children twice a month, but that she failed to attend visitation on certain occasions; that the children were disappointed when this occurred, but

grew accustomed to it as they got older; and, that she did not notify Karen when Thomas died.

{¶11} Subsequently, the magistrate issued his decision finding that, pursuant to R.C. 3109.04(D)(2), if the court found it was in the best interest of the children for neither parent to be designated the residential parent and legal custodian of the children, it could commit the children to a relative; that, under *In re Perales* (1977), 52 Ohio St.2d 89, custody could not be awarded to a non-parent without demonstration of one of the following circumstances by a preponderance of the evidence: (1) the parent abandoned the child, (2) the parent contractually relinquished custody of the child, (3) the parent had become totally incapable of supporting or caring for the child, or (4) an award of custody to the parent would be detrimental to the child; that the children had not visited with Karen in the past three years; that the children did not know where Karen lived in Sidney; that Vincent testified he barely knew his mother; that Karen admitted she had known where the children were living, at least part of the time; and, that the Yeagers demonstrated by a preponderance of the evidence that Karen abandoned the children. Alternately, the magistrate determined that the Yeagers had also demonstrated by a preponderance of the evidence that an award of custody to Karen would be detrimental to the children, based on the fact that Karen did not know the name of the children's teachers, had not been to their school, and was

completely uninvolved in their education; that the children were not familiar with Karen's neighborhood and did not know where she lived; and, that Karen was a "virtual stranger" to the children. (Magistrate's Decision, p. 6). Accordingly, the magistrate concluded that the children should be placed in the Yeagers' custody. Additionally, the magistrate appointed a guardian ad litem (hereinafter referred to as "GAL") on behalf of the children pursuant to Civ.R. 75(B)(2), finding that appointment was necessary to protect the best interests of the children.

{¶12} In February 2009, Karen filed objections to the magistrate's decision after receiving an extension of time, and argued that the magistrate's finding that placing the children in her custody would be detrimental to the children was unsupported by the evidence; that the magistrate did not include the necessary factors to support his finding that she had abandoned the children; and, that evidence demonstrated that she had maintained telephone contact with the children over the three-year period.

{¶13} On March 20, 2009, the trial court issued its decision on Karen's objections, finding that there was no evidence that Karen had abandoned the children because she had provided financial support for them and communicated with them telephonically. Additionally, the trial court found that little evidence was presented to demonstrate that awarding Karen custody of the children would be detrimental to them; that the children's in camera testimony did not

demonstrate detriment; and, that the evidence demonstrated Karen was a capable parent. Accordingly, the trial court determined that the Yeagers should retain temporary custody of the children, with Karen's visitation time gradually being extended, with the goal of her gaining permanent custody in fall of 2009.

{¶14} In April 2009, the Yeagers filed a motion for relief from judgment pursuant to Civ.R. 60(B), on the basis that, when the trial court filed its decision, the GAL appointed in the case had not yet filed his report, and thus, the trial court did not have all of the facts in order to determine the issues of abandonment and detriment to the children. Additionally, the Yeagers contended that they had never received a copy of Karen's February 2009 objections. The trial court declined to rule on the Civ.R. 60(B) motion because its decision had been appealed to this Court.[2]

{¶15} It is from this judgment that the Yeagers appeal, presenting the following assignment of error for our review.

> **THE TRIAL COURT ERRED IN FAILING TO UPHOLD THE DECISION OF THE MAGISTRATE FINDING THAT TRANSFER OF CUSTODY OF THE CHILDREN TO DEFENDANT-APPELLEE MOTHER FROM THE PATERNAL AUNT AND UNCLE WAS DETRIMENTAL TO THE CHILDREN.**

---

[2] The Yeagers concede that the issue concerning the lack of a GAL report and the dispute regarding service of Karen's objections on the Yeagers are the subject of a second appeal and are not at issue in this appeal.

{¶16} In their sole assignment of error, the Yeagers argue that the trial court erred in sustaining Karen's objections to the magistrate's decision and determining that transfer of custody of the children to Karen would not be detrimental to the children. Specifically, the Yeagers contend that the case upon which the trial court relied, *Lorence v. Goeller*, 9th Dist. No. CIV A 04 CA 008556, 2005-Ohio-2678, is distinguishable from the situation at issue; that the situation at issue is more comparable to that in *In re Dunn* (1992), 79 Ohio App.3d 268; that the trial court's finding that Karen's home was "appropriate" was not supported by any credible evidence, including any GAL report; and, that the trial court's finding that Karen had raised two other children "successfully" was not supported by any credible evidence and was irrelevant to her ability to parent the Scavio children.

{¶17} Decisions concerning the allocation of parental rights and responsibilities pursuant to R.C. 3109.04(E) rest within the sound discretion of the trial court. *Miller v. Miller* (1988), 37 Ohio St.3d 71, 74; *Erwin v. Erwin*, 3d Dist. No. 14-05-45, 2006-Ohio-2661, ¶12. Custody determinations are some of the most difficult and agonizing decisions a trial court must make, and, therefore, an appellate court must grant wide latitude in its consideration of the evidence. *Davis v. Flickinger*, 77 Ohio St.3d 415, 418, 1997-Ohio-260. Thus, we will not reverse a child custody decision that is supported by a substantial amount of competent,

credible evidence absent an abuse of discretion. *Bechtol v. Bechtol* (1990), 49 Ohio St.3d 21, at syllabus.

{¶18} Jurisdiction in child custody disputes arises under one of two separate statutes, R.C. 3109.04 and R.C. 2151.23. *Smith v. Boyd*, 3d Dist. No. 13-05-49, 2006-Ohio-6931, ¶40, citing *In re S.M.*, 160 Ohio App.3d 794, 2005-Ohio-2187, ¶8. Child custody dispute jurisdiction is conferred on the domestic relations court pursuant to R.C. 3109.04(A) when the custody proceedings arise out of "any divorce, legal separation, or annulment proceeding and in any proceeding pertaining to the allocation of parental rights and responsibilities for the care of a child * * *." R.C. 3109.04(A). Conversely, R.C. 2151.23(A)(2) vests jurisdiction for custody disputes in the juvenile court for "any child not a ward of another court of this state," which typically encompasses all custody disputes between parents and non-parents. See *In re Brayden James*, 113 Ohio St.3d 420, 2007-Ohio-2335, ¶38 (Lundberg Stratton, J., dissenting); *Huff v. Carson*, 3d Dist. No. 5-07-05, 2007-Ohio-5194, ¶25.

{¶19} When jurisdiction for the custody proceeding lies with the domestic relations court, R.C. 3109.04 generally requires the trial court to conduct a two-part test in order to modify custody. First, the trial court must determine whether a change in circumstances has occurred for the child, the child's residential parent, or either of the parents in a shared parenting decree. Second, if the court finds a

change in circumstances, it must then determine whether such a modification would be necessary to serve the best interest of the child, and it must find one of three circumstances listed in the statute to be present. See *Lawrence v. Lawrence*, 3d Dist. No. 1-2000-74, 2001-Ohio-2190.

**{¶20}** Underlying both R.C. 3109.04 and R.C. 2151.23 is the principle that parents are imbued with the fundamental right to care for and retain custody of their children. *In re Shaeffer Children* (1993), 85 Ohio App.3d 683, 689, citing *Santosky v. Kramer* (1982), 455 U.S. 745; see, also, *In re Hockstok*, 98 Ohio St.3d 238, 2002-Ohio-7208, ¶16. Additionally, within this fundamental right is the idea that "'the custody, care and nurture of the child [should] reside first in the parents[.]'" *In re Honse Children*, 3d Dist. Nos. 5-08-45, 5-08-46, 5-08-47, 2009-Ohio-1913, ¶5, quoting *Stanley v. Illinois* (1972), 405 U.S. 645, 651. Accordingly, "'a parent's right to the custody of his or her child has been deemed 'paramount' when the parent is a suitable person.'" *Boyd*, 2006-Ohio-6931, at ¶41, quoting *In re Hayes* (1997), 79 Ohio St.3d 46, 48.

**{¶21}** In order to protect and preserve natural parents' fundamental right to the custody of their children, the Supreme Court of Ohio has required that, in an R.C. 2151.23(A)(2) custody proceeding between a parent and non-parent, the trial court must make a finding of parental unsuitability before awarding custody to the non-parent, namely that "the parent abandoned the child, that the parent

contractually relinquished custody of the child, that the parent has become totally incapable of supporting or caring for the child, or that an award of custody to the parent would be detrimental to the child." *In re Perales*, 52 Ohio St.2d 89, at syllabus. This Court has previously noted that "courts must measure suitability in terms of the harmful effect on the child, not in terms of society's judgment of the parent." *In re Dunn*, 79 Ohio App.3d at 271, citing *Perales*, 52 Ohio St.2d at 98.

**{¶22}** The rationale for the requirement of a parental unsuitability finding for custody proceedings under R.C. 2151.23(A)(2) is because custody proceedings that arise under R.C. 3109.04 typically involve disputes evolving from divorce actions, thereby involving two parents, both of whom are usually equally qualified to raise the child. *Perales*, 52 Ohio St.2d at 96. However, the Supreme Court of Ohio has extended the requirement that parental unsuitability be found when awarding custody of a child to a non-parent even when the custody proceeding arises in the domestic relations court under R.C. 3109.04. See *Hockstok*, 98 Ohio St.2d 238, at ¶¶27-29. The reason for undertaking a parental unsuitability analysis under these circumstances is clear; even though the custody proceedings arise under R.C. 3109.04, the rationale for the test, to protect the fundamental right of parents, exists because the custody proceedings are between a parent and a non-parent. Additionally, the non-parent seeking custody bears the burden of demonstrating parental unsuitability. *In re Porter* (1996), 113 Ohio App.3d 580.

{¶23} Finally, where a trial court determines that a parent is suitable for custody and the parent has not previously lost custody of the child to a non-parent, the trial court does not need to further determine that a change in circumstances has occurred or that custody is in the best interest of the child. Cf. *Purvis v. Hazelbaker*, 181 Ohio App.3d 167, 2009-Ohio-765, ¶10 (finding that "if a custody award has previously been made to a nonparent, the party seeking to modify that award must show a change-in-circumstances/best-interest issue even if the noncustodial party is a parent and the custodial party is a nonparent."). We note that, although we considered the change in circumstances and best interest factors in *Hewitt v. Hewitt*, 3d Dist. No. 14-08-48, 2009-Ohio-6525, such analysis was not necessary for our disposition affirming the trial court's grant of custody to the biological mother, given that the trial court determined the mother was suitable.

{¶24} In *Lorence*, 2005-Ohio-2678, which the Yeagers contend is distinguishable from the situation at issue, the Ninth Appellate District found that granting custody to a biological parent as opposed to a non-parent would not be detrimental to a child where the child lived with the non-parent for the first eleven years of his life, but the parent had exercised expansive visitation with the child since he was four years old; where the parent appropriately cared for the child and provided an adequate home and financial support for the child; and, where, although awarding of custody to the parent would necessitate the child's moving

into a new neighborhood and attending a new school, the child was familiar with the neighborhood due to visitation and had already experienced significant changes.

{¶25} In *In re Dunn*, 79 Ohio App.3d 268, which the Yeagers contend is more analogous to the situation sub judice, this Court affirmed a trial court's award of custody of two children to a non-parent on the basis that the children's parent was unsuitable because the children would never accept the parent as their mother; that, if the children were removed from the non-parent, it would have a "devastating" and "detrimental" effect on their emotional stability; that the children had become integrated into the non-parent's community; and, that the children considered the non-parent to be their mother and did not view the biological parent as a parental figure. We note that, although this decision noted that psychological examinations of the children were presented at the hearing and the judge interviewed the children in chambers, it did not indicate on what evidence the trial court's decision relied.

{¶26} Here, we find that a substantial amount of competent, credible evidence supported the trial court's determination that Karen was a suitable parent and its grant of custody of the children to Karen. Although the Yeagers contend that the trial court's finding that Karen's home was "appropriate" was not supported by any credible evidence, including any GAL report, and that the trial

court's finding that Karen had raised other children "successfully" was not supported by any credible evidence and was irrelevant to her ability to parent the Scavio children, we emphasize that the Yeagers, as non-parents seeking custody, carried the burden of demonstrating Karen's unsuitability as a parent. See *In re Porter*, supra. Karen testified at the hearing that she was employed as a nurse and was capable of financially supporting the children; that she owned a four-bedroom home with sufficient room for the children; that no child in her custody had ever been adjudicated neglected, dependent, or abused; that she had health insurance; that she had not physically visited with the children for three years, but that she maintained a relationship with them via telephone; and, that Thomas and the children moved often prior to his death and he did not always immediately report his change of address to her, which interfered with her ability to visit the children. The Yeagers presented no testimony demonstrating that Karen's home was inappropriate, that she had unsuccessfully parented her four eldest children, or that the children's GAL believed awarding her custody would be detrimental to the children.

{¶27} Although the Yeagers presented testimony that Karen had not physically visited with the children for several years, was not familiar with the children's schooling, activities, or medical issues, and that she had disappointed the children by missing visitations on occasion, we cannot find that the trial court

abused its discretion in finding that Karen was a suitable parent and that awarding her custody would not be detrimental to the children. This is particularly so given the underlying principle of R.C. 3109.04 that parents possess a fundamental right to custody of their children. See *In re Shaeffer Children*, 85 Ohio App.3d at 689. Additionally, although some of the evidence presented in the case sub judice was distinguishable from that in *Lorence*, supra, and some of the evidence was similar to that in *In re Dunn*, supra, we cannot find that the facts before us are so similar or dissimilar to either case as to persuade us that the trial court abused its discretion in its decision that Karen was a suitable parent. In doing so, we emphasize that the trial court, as the finder of fact, possesses sound discretion of the allocation of parental rights and responsibilities, and that we must grant the trial court wide latitude in its consideration of the evidence. See R.C. 3109.04; *Miller*, 37 Ohio St.3d at 74; *Davis*, 77 Ohio St.3d at 418.

{¶28} Accordingly, we overrule the Yeagers' sole assignment of error.

{¶29} Having found no error prejudicial to the appellants herein, in the particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment Affirmed*

**SHAW and PRESTON, J.J., concur.**

**/jlr**